## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

LEVI JOHNSON,

*Defendant*.

Criminal No. ELH-99-352

## MEMORANDUM OPINION

Levi Johnson[1] is serving a sentence of life imprisonment for a drug trafficking crime that also involved murder.  ECF 403.  He has been incarcerated since August 18, 1999, when he was twenty-one years old.  ECF 26; ECF 36; ECF 709-1 at 1.[2]

Johnson has filed a "Motion for a Sentence Modification Pursuant to 18 U.S.C. § 3582(1)(A)(i)."  ECF 685.  It is supported by three exhibits, including medical records.  ECF 685-1 to ECF 685-3.  Through court-appointed counsel, Johnson filed a "Supplemental Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(1)(A)(i)" (ECF 709), supported by a memorandum (ECF 709-1) (collectively, the "Supplement"), and four exhibits.  ECF 709-2 to ECF 709-5.  I shall refer to ECF 685, ECF 709, and ECF 709-1 collectively as the "Motion."

---

[1] In some documents, defendant's first name appears incorrectly as "Levy."

[2] The case was originally assigned to Judge Marvin Garbis, who has since retired.  The case was reassigned to me in July 2018.  *See* Docket.

In his Motion, Johnson asks the Court to reduce his sentence to thirty years of imprisonment.  ECF 709-1 at 2.  The government opposes the Motion and has submitted one exhibit.  ECF 714.  Defendant has replied.  ECF 715.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion, in part.  In particular, I shall reduce the sentence to 35 years of imprisonment (420 months), with credit from August 18, 1999.

## I.      Background[3]

On August 12, 1999, a grand jury in the District of Maryland returned an Indictment charging Johnson and several others with conspiracy to distribute heroin in Baltimore.  ECF 1. Defendant was arrested on August 18, 1999.  ECF 721 ("Presentence Report" or "PSR").[4]  He was detained pending trial.  ECF 36.

Defendant and five others were charged with drug and firearms offenses in a Superseding Indictment filed on August 19, 1999.  ECF 33.  A Third Superseding Indictment, filed in April 2000, added a seventh defendant.  ECF 210.  Then, on April 17, 2001, a Fourth Superseding Indictment was filed.  ECF 304.  Johnson was charged in Count One with conspiracy to distribute and possession with intent to distribute heroin, in violation of 21 U.S.C. § 846.  *Id.*; *see also* ECF 721 at 1.  In addition, Johnson and codefendants Stover Stockton and Antonio Hayes were charged in Count Two with conspiracy to murder an officer or employee of the United States, *i.e.*, U.S.

---

[3] Due to the age of the case, many of the pleadings are not available on the electronic docket.  Filings became consistently available electronically in 2008, with sporadic availability prior to that time.

[4] I located the Presentence Report in the Chambers file of Judge Garbis.  I also received a copy of the Presentence Report from defendant's counsel.  I submitted it for docketing, under seal. *See* ECF 721.  Additionally, I located the transcript of the sentencing hearing of October 26, 2001, in the Chambers file of Judge Garbis and have submitted it for docketing as well.  *See* ECF 722.

District Judge Benson Legg, and in Count Three with the same conduct as to then Assistant U.S. Attorney Richard Bennett, in violation of 18 U.S.C. § 1117.[5]  ECF 304 at 8, 9.

Several codefendants pleaded guilty.  Johnson and Stover Stockton proceeded to a jury trial in January 2001.  *See* Docket.  Judge Marvin Garbis, to whom the case was assigned, presided at the trial.  The case of codefendant Rolando Stockton, the brother of Stover Stockton, was severed for trial.[6]  I shall sometimes refer to Stover Stockton and Rolando Stockton by their first names, to avoid confusion.

At the trial of Johnson and Stover Stockton, the government presented evidence of a heroin trafficking conspiracy in the Park Heights neighborhood of Baltimore City that extended from 1994 through April 2000.  ECF 721, ¶ 1.  *See United States v. Johnson*, 71 F. App'x 200, 202 (4th Cir. 2003) (per curiam). The government also presented evidence that the conspiracy used violence to effectuate its objectives, including the murders of Donale Crawford and Quinton Matthews. ECF 721, ¶¶ 10, 17.  *See also*, *e.g.*, ECF 656 (PSR of Stover, referencing two murders and assaults of others), ¶¶ 9, 16.   And, the total quantity of heroin involved in the offense exceeded ten kilograms.  ECF 721, ¶¶ 8, 15.  During the life of the conspiracy, Johnson's age ranged from 16 in 1994 to 22 years of age in 2000.  ECF 709-1 at 3 n.4.

---

[5] Judge Legg has now retired.  And, Richard Bennett now serves as a Senior District Judge.

[6] Rolando Stockton was not charged in Count Two or Count Three.  Therefore, his case was severed for trial.  *See United States v. Rolando Stockton*, ELH-99-352, ECF 570 at 9–10.  He was the only defendant named in a Fifth Superseding Indictment, filed on April 17, 2001.  ECF 372.  There, he was charged with conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846 (Count One); use of a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts Two and Three); and felon in possession, in violation of 18 U.S.C. § 922(g)(1) (Counts Four and Five).

After a sixteen-day trial, the jury convicted both defendants of Count One.  But, the jury was unable to reach a verdict with regard to counts Two and Three.  *See* ECF 366 (Verdict); ECF 721, ¶ 2.[7]

As to Count One, the PSR calculated a base offense level of 36 for Johnson.  ECF 721, ¶ 15.  It was adjusted upwards on several grounds, for a total offense level of 51.  *Id.* ¶ 25.  The upward adjustments included application of the murder cross-reference, pursuant to § 2D1.1(d)(1) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  *Id.* ¶ 17.

By Memorandum dated October 25, 2001, and docketed on October 26, 2001, Judge Garbis issued a ruling with respect to Guidelines issues for the defendants.  ECF 402.  He agreed that Johnson had a base offense level of 36.  *Id.* at 5.  And, he concluded that, under U.S.S.G. § 2D1.1(b)(1), Johnson was subject to a two-level increase in his offense level for firearm possession.  *Id.*  Additionally, Judge Garbis found that Johnson was subject to the murder cross-reference under U.S.S.G. § 2D1.1(d)(1), as "[t]he Government has carried its burden of proof as to . . . establishing that Johnson personally killed Quentin Matthews."  *Id.* at 6–7.  As a result, Johnson's base offense level was increased to 43.  *Id.* at 7.

Further, Judge Garbis concluded that Johnson was subject to a four-level increase for his role in the conspiracy, pursuant to § 3B1.1.  *Id.* at 7.  Judge Garbis found that the issue of whether Johnson used a minor in carrying out the conspiracy was moot because, "[i]n view of the Offense

---

[7] After the trial of Stover and Johnson, Rolando proceeded to trial.  He was convicted of Counts One, Two, Three, Four, and Five.  ECF 394; *see United States v. Rolando Stockton*, 349 F.3d 755, 765 (4th Cir. 2003).  But, prior to sentencing, the court vacated the § 924(c) conviction in Count Three.  *See* ECF 415 (motion to vacate); ECF 420 (Order granting motion to vacate); *but see* ECF 570 at 2 n.1 (Memorandum Opinion of Judge Garbis, stating that government dismissed the § 924(c) count prior to sentencing); *see also* ECF 670 at 2 n.3 (government stating that the court vacated the conviction).

Level computed for Johnson without such an adjustment, a further two (2) Offense Level increase would have no effect upon the Guidelines sentence." *Id.* at 8 n.4; *see* U.S.S.G. § 3D1.4.

Moreover, Judge Garbis stated that "the evidence does not establish that there was any plot or conspiracy to kill Judge Legg or Assistant United States Attorney Bennett." ECF 402 at 9. Indeed, Judge Garbis characterized it as a "phony assassination plot." *Id.* at 10. Therefore, the Court declined to award an adjustment of two levels under § 3C1.1 for obstruction of justice. *See* ECF 721, ¶ 22. Johnson's final offense level was 47. ECF 402 at 13. But, the maximum offense level under the Guidelines is 43.

Johnson faced a mandatory minimum sentence of ten years of incarceration under 21 U.S.C. §§ 841(b) and 846. ECF 721, ¶ 46. Moreover, he had eight criminal history points, reflecting a criminal history category of IV, for crimes that Johnson primarily committed as a juvenile. These included assaults and felony drug offenses. *Id.* ¶¶ 27–32. He also had one adult conviction, for battery and handgun on person. *Id.* ¶ 34.

The Guidelines called for a sentence of life imprisonment. *Id.* ¶ 47. And, of import here, at that time the Guidelines were mandatory, not advisory. *See United States v. Booker*, 543 U.S. 220 (2005).

Sentencing was held on October 26, 2001. *See* ECF 722. The defendant, who was born in 1977, was 23 years of age at that time. ECF 721 at 1.

Judge Garbis stated that he believed a life sentence was inappropriate, but he observed that he was obligated to impose a life sentence under the Guidelines. ECF 722. Specifically, he stated, *id*. at 2–3:

> I think that the guideline determination mandates a sentence. If there were a way to depart that would be sustainable I would depart. That is why I want the record to be very, very clear that if there is any basis on which you think the Fourth Circuit would approve a departure, I want you to make a record of it, and I want

you to present that to the Fourth Circuit, because I would prefer, I think a just reason why a just sentence would be less than [a] life sentence in this case on the basis that I do not believe that is warranted.

I believe it would be more appropriate to give a sentence, a very, very substantial one in which there won't be a prospect of release.

Notably, Judge Garbis also said, *id.* at 5: "I don't find that I would be permitted to depart on the totality of the circumstances, but if I were permitted I would depart."

Defendant allocuted at his sentencing. *Id.* at 8. He said, in part, *id.*: "I maintained my innocence throughout the trial and still do . . . ." Further, he said, *id.*: "As far as the murder of Quentin Matthews, I didn't kill that man . . . ."

In sentencing Johnson to a term of life imprisonment, Judge Garbis stated, in part, *id.* at 12–13:

I think that I have to do what the guidelines say unless [defense counsel] is able to persuade the Court of Appeals that there is a valid reason for a departure because I would accept it.

I believe that you sit here with Mr. Johnson who is 24 years of age and I am not at all sure he is going to be the same person at fifty four or fifty five or sixty four and I have to make that assumption.

It may not be warranted certainly in view of Mr. Johnson's background. It is not anything to diminish his crime or diminish the need for significant punishment, et cetera, but I do not think that this is something that is easy for automatic or even that is warranted in this case. I do not believe in taking that hope away.

The sentence that is imposed under the guidelines is [a] sentence of life imprisonment without parole, however, in fact there is a possibility that Mr. Johnson could be released under certain circumstances, so if he is, he would be on five years of supervised release, if that would occur.

Johnson noted an appeal to the Fourth Circuit. ECF 405. The Fourth Circuit affirmed on August 22, 2003. *See United States v. Johnson*, 71 Fed. App'x 200 (4th Cir. 2003); ECF 463. Then, on December 16, 2004, Johnson filed a Motion to Vacate under 28 U.S.C. § 2255. ECF

469.  By Memorandum and Order of May 3, 2005, Judge Garbis denied the petition.  ECF 478.

Thereafter, Johnson appealed to the Fourth Circuit and sought a Certificate of Appealability.  ECF

483.   On November 28, 2005, the Fourth Circuit denied the request for a Certificate of

Appealability and dismissed the appeal.  ECF 492.  Johnson filed a second motion to vacate under

28 U.S.C. § 2255 on October 29, 2009.  ECF 548.  Judge Peter J. Messitte dismissed that motion

on November 10, 2009.   ECF 549.   And, on August 12, 2016, the Fourth Circuit denied

authorization to Johnson to file a successive § 2255 motion.  ECF 611.

On October 10, 2021, Johnson submitted a request for compassionate release to the Warden

of U.S.P. Victorville in California, where he is presently incarcerated.  ECF 709-1 at 6; ECF 709-

3 at 3.  He submitted an additional request on December 7, 2021.  ECF 709-3 at 2.  Johnson did

not receive a response from the Warden.  ECF 709-1 at 6.

Johnson filed his Motion on April 5, 2022.  ECF 685.  Multiple family members have

submitted letters supporting Johnson's Motion.  ECF 697 to ECF 702; *see also* ECF 709-5

(duplicates of letters).   Johnson has also written to the Court.   ECF 704.   Through counsel,

defendant supplemented the Motion on February 21, 2023.  ECF 709.

Johnson is now 45 years old.  ECF 709-1 at 1.  He has served nearly 24 years in prison.  As

defendant notes, he "has already spent more time in prison than out."  *Id.*

Additional facts are included, *infra*.

## II.   Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

18 U.S.C. § 3582(c); *see United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States*

*v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir.

2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55

F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

With the passage of the First Step Act ("FSA") in 2018, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173; *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)).  Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194.  This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984.  As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the Bureau of Prisons ("BOP"). *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g., Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was exceedingly rare, because the BOP rarely filed motions on an inmate's behalf. *See Hr'g on Compassionate Release and the Conditions of*

*Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013. However, as a result of the enactment of the FSA in December 2018, a federal inmate may file a motion for compassionate release directly with the court, after exhausting administrative remedies. *See United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

In particular, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constituted a sea change in the law.

Nonetheless, there are restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criterion is met,

the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy*, 981 F.3d at 276–77.[8] In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

However, as the Fourth Circuit has recognized, there is currently no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A).  *See*, *e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276.  Of significance here, the policy statement in U.S.S.G. § 1B1.13

---

[8] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy*, 981 F.3d at 276.

was issued in 2006 and was last updated in November 2018, *before* the enactment of the FSA. Moreover, it is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."[9] *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker*, 976 F.3d 228, 235–36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100–02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

"Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *Id.* at 283; *see also Hargrove*, 30 F.4th at 194–95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam). Indeed, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Although the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c), "the court may consider these guidelines in defining

---

[9] This will soon change. On November 1, 2023, an amended policy statement, expressly made applicable to defendant-filed motions, will take effect. *See Sentencing Guidelines for United States Courts*, 88 Fed. Reg. 28254 (May 3, 2023) (proposed U.S.S.G. § 1B1.12(b)(1)(A)–(C)). Notably, even if the amendment were already in effect, I would reach the same result.

what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Jenkins*, 22 F.4th at 169 (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. However, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

Of relevance here, the Supreme Court decided *Concepcion v. United States*, 597 U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6. The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . . The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183–84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2. Where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3. However, such developments do not warrant a recalculation of the Guidelines. *Troy*, 64 F.4th at 184.

12

Among other things, "successful rehabilitation efforts can be considered" as part of the court's analysis of extraordinary and compelling reasons.  *United States v. Harris*, 2022 WL 636627, at \*1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, 2023 WL 245001, at \*4 (4th Cir. Jan. 18, 2023) (stating that, in considering a compassionate release motion, the district court erred by failing to address the defendant's evidence of rehabilitation). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at \*1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at \*1; 28 U.S.C. § 994(t).

In addition, a sentence disproportionately long in relation to sentences received by other similarly situated defendants, or in relation to the sentence that the defendant would receive under currently applicable law, can constitute a basis for a sentence reduction.  *Brown*, 78 F.4th at 131–34; *McCoy*, 981 F.3d at 285–86.

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at \*2–3 (W.D.N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court's inquiry is not over.  The court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54

F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors).

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). Notably, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error

14

of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors). And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189. In addition, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

15

### III.   COVID-19[10]

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020. *United States v. Pair*, ___ F. 4th ___, 2023 WL 6989947, at *1 (4th Cir. Oct. 24, 2023). Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[11]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.   That declaration was extended on several occasions. *See, e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19, which is extremely contagious, spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  For a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  Businesses and schools were closed or operated on a limited basis, in an effort to thwart the spread of the virus. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  The judiciary, too, faced many operational challenges.  As the

---

[10] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[11] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

Fourth Circuit recently explained, in the early months of 2020, "a new reality set in.  Nations around the world announced stringent limitations on-in person interaction . . . businesses ground to a halt; and death tolls mounted."  *Pair*, 2023 WL 6989947, at *1.

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in more detail the "unprecedented nature and impact" of the pandemic.  *Id.*  Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, Reuters (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://perma.cc/J7XS-FYHT.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19. The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk

conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from COVID-19." *Bethea*, 54 F.4th at 832.

**B.**

As noted, the virus is "highly contagious." *Pair*, 2023 WL 6989947, at *9. At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.* at *9. Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 2023 WL 6989947, at *5.

However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2. Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and*

*Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020), https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 posed to inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division,

issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

Although there is no cure for the coronavirus, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Sept. 15, 2023), https://perma.cc/ST6Y-NCV3.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW.  It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since that time.  The BOP has administered 347,534 doses of the COVID-19 vaccine to inmates and staff, and booster shots are available to inmates in accordance with CDC guidance.  *See COVID-19: Coronavirus*, BUREAU OF PRISONS, https://perma.cc/3KRC-8JNJ (last visited Sept. 21, 2023).  And, as of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days),

including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, Ctrs. for Disease Control, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, Ctrs. for Disease Control, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared the pandemic "over" in the United States.  Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS News (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id.*  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."  Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nonetheless, at the time of writing, data suggests that COVID-19 remains prevalent.  *See COVID Data Tracker*, Cntrs. For Disease Control & Prevention (September 18, 2023), https://perma.cc/6HG6-C949.  However, there are only two "open cases" of COVID-19 at U.S.P Victorville, where Johnson is one of about 4,253 inmates.  *See Inmate COVID-19 Data*, Federal Bureau of Prisons, https://perma.cc/9PNK-CA8X (last updated October 26, 2023).

### IV.   Discussion

Johnson seeks a reduction of his sentence to thirty years, pursuant to 18 U.S.C. § 3582(c)(1)(A).  In his original Motion, Johnson offered five reasons which he claims constitute an "extraordinary and compelling" basis for his release: "1) Mr. Johnson's age, 2) significant

change in the sentencing law landscape since the court sentenced petitioner, 3) the coronavirus 19 (COVID-19) pandemic confinement conditions that resulted in long haul COVID-19 medical complications, 4) his co-conspirators['] sentence disparity, and 5) Mr. Johnson's rehabilitation." ECF 685 at 1.

In his Supplement, Johnson reiterated and reframed these grounds to include "the dramatic disparity between Mr. Johnson's sentence and the lower one he would receive if prosecuted today; the brutalizing hardships he confronted in his early life; his youth at the time of the offense conduct; and, his post-offense rehabilitation."  ECF 709-1 at 1–2.  Further, he clarified that his age and background should be considered as factors rather than independent bases for release; specifically, Johnson contends that "the disparity between the sentence Mr. Johnson received and the lower sentence he would receive if sentenced today, taken together with the extremely harsh deprivations he endured as a young person, his young age at the time of the offense, and his post-offense rehabilitation, present extraordinary and compelling reasons for sentencing relief."  *Id.* at 6–7 (capitalization and bolding removed).  Additionally, Johnson argues that he is not a danger to the community.  *Id.* at 18.  And, notably, while Judge Garbis applied the murder cross-reference at sentencing for the murder of Mr. Matthews, Johnson was never charged with the murder of Mr. Matthews.  *See* ECF 721; ECF 685 at 21.

As noted, the government opposes the Motion.  ECF 714.  In addition to arguing that Johnson's reasons do not constitute an "extraordinary or compelling" basis for relief, *id.* at 1, the government contends that the factors under 18 U.S.C. § 3553(a) foreclose Johnson's release.  *Id.* at 9.

### A.  Changes in Sentencing Law

Johnson maintains that changes in sentencing law over the past 24 years provide an "extraordinary and compelling reason for release."  ECF 685 at 11.

Critically, when Johnson was sentenced, the Guidelines were mandatory, not advisory. Therefore, although Judge Garbis expressly indicated his disagreement with a life sentence, he was nonetheless required to impose a life sentence, pursuant to the Guidelines.  Johnson contends that "the life sentence petitioner received in 1999, 'today exceeds what is sufficient to achieve the sentencing purposes under § 3553(a).'"  *Id.* at 13.  He asserts, *id.* at 11:

> Statistics compiled by the U.S. Sentencing Commission found that the average sentence imposed for drug trafficking was 76 months, and for murder 255 months.  Id.  Furthermore, statistics released by the commission for fiscal year 2018 found that the Fourth Circuit's murder sentence averaged 327 months.  Id., also see United States v. Bryant, 2020 U.S. Dist. LEXIS 75681 at 5, n.8 (D.Md. Apr. 30, 2020), United States v. Redd, [4]44 F. Supp. 3d 717, 728 (E.D.Va. 2020).

Further, defendant states, *id.* at 12:

> Today, it is likely petitioner would not receive a life sentence, if he was sentenced in this District today.  For one, the guidelines are now advisory, "not mandatory."  Also, today, petitioner's life sentence is out of line with similarly situated defendants in this District, see United States v. Antoine, PWG-19-140, ECF 349-465: Defendant was involved in a drug trafficking organization in Baltimore.  He confessed to intentionally killing an individual for the drug conspiracy.  He received a total sentence of 270 months, id.

In defendant's Supplement, he reiterates that his "sentence far exceeds the one he would receive if prosecuted today, as demonstrated by recent sentence reductions."  ECF 709-1 at 7. Further, Johnson contends, *id.* at 9: "Because of the mandatory nature of the Guidelines at sentencing, the Court was required to impose a life sentence as to Count One because the Court found the first degree murder cross-reference applicable which dictated a Base Offense Level of 43, and, consequently, a sentencing range of life."  Yet, defendant points out that "this Court

frequently imposes sentences 'within the thirty-year range on defendants involved in drug-related killings,' whose guidelines ranges call for a sentence of life." *Id.* at 8.

Indeed, Johnson cites multiple cases where "judges in the District of Maryland have reduced sentences to around 30 years for defendants who were found to have committed a murder (or multiple murders), and who were, in most cases, relatively the same age as Mr. Johnson at the time that he killed Mr. Matthews." *Id.* at 9; *see, e.g., United States v. Fleming*, ELH-08-00086, ECF 1836 (D. Md. March 11, 2022) (reducing life sentence to 30 years for defendant sentenced pursuant to the murder-cross reference "after considering [defendant's] difficult upbringing, his youth at the time of the shooting (19 years old), his rehabilitative efforts while incarcerated, and his expressions of remorse for his prior criminal acts, and the fact that 'Fleming's sentence of life imprisonment is far in excess of more recent sentences in this District for similar offenses'") (quotation in ECF 709-1 at 9); *United States v. Williams*, CCB-07-0402, ECF 143 (D. Md. Aug. 23, 2021) (reducing life sentence to 30 years for defendant previously "sentenced pursuant to the U.S.S.G. § 2A1.1 cross-reference for murder") (quotation in ECF 709-1 at 9); *United States v. Martin*, RDB-04-029, ECF 868 (D. Md. July 27, 2021) (reducing 400-month sentence to 300 months for defendant found guilty of drug and racketeering charges because the sentence of 300 months was "'consistent with this Court's current sentencing practices for similar crimes'"); *United States v. Babb*, ELH-04-0190, ECF 275 (D. Md. June 7, 2021) (defendant found guilty of drug trafficking and use of a firearm received a sentence of 30 years despite the fact that, "at sentencing, his guidelines were calculated under § 2A1.1") (quotation in ECF 709-1 at 10); *United States v. Gray*, CCB-05-0364, 2021 WL 1856649 (D. Md. May 10, 2021) (reducing life sentence to time served of 26 years for defendant "found guilty of murder in aid of racketeering and possession of a firearm in furtherance of a crime of violence," because of "his difficult upbringing,

his relative youth [age 23] at the time of the shooting, and his record of rehabilitation") (quotations in ECF 709-1 at 10); *United States v. Cheese*, ELH-98-0359, ECF 911 (D. Md. July 2, 2020) (reducing life sentence first to 28 years and later to time served (slightly less than 23 years served) for defendant who was part of a "'very violent' drug-trafficking organization" and "was sentenced to life pursuant to the cross-reference under § 2A1.1") (quotation in ECF 709-1 at 10); *United States v. Julius Brown et al.*, ELH-00-0100, ECF 414, ECF 424, ECF 465 (D. Md. Dec. 17, 2020) (reducing life sentences to 40 years, 35 years, and time served (20 years) for three defendants found guilty of "drug- and gun-related charges" and for whom "Judge Davis applied the murder cross-reference and imposed sentences of life plus 30 years for each of the three men") (quotation in ECF 709-1 at 10); *United States v. Holland*, GLR-96-0399, ECF 661 (D. Md. Aug. 18, 2021) (reducing life sentence to 35 years for defendant sentenced under § 2A.1, and who was alleged to have been "the leader of a violent drug trafficking organization that was responsible for murders, robberies, and significant narcotics") (quotation in ECF 709-1 at 11); *United States v. Ahmad Linton*, JKB-98-258, ECF 471 (D. Md. Sept. 27, 2021) (reducing life sentence to 30 years for defendant convicted of "murder in aid of racketeering which he participated in when he was just twenty two years old") (quotation in ECF 709-1 at 11).[12]

In response, the government argues that "it is [not] extraordinary and compelling for a defendant to have [to] serve the original sentence imposed if it was lawfully imposed at the time and it is still lawful today, which is the case here." ECF 714 at 7.

The United States Sentencing Commission is an agency that "Congress has tasked with promulgating 'guidelines . . . for use of a sentencing court in determining the sentence to be

---

[12] It is important to note that the various cases are factually distinct and cannot easily be summarized in a parenthetical.

imposed in a criminal case.'" *United States v. Furlow*, 928 F.3d 311, 314 n.1 (4th Cir. 2019) (quoting 28 U.S.C. § 994(a)(1)), *vacated on other grounds*, __ U.S. __, 140 S. Ct. 2824 (2020). The Guidelines are the "foundation of federal sentencing decisions." *Hughes v. United States*, —– U.S. ——, 138 S. Ct. 1765, 1775 (2018). Indeed, the sentencing Guidelines have been described as "the lodestone of sentencing," *Peugh v. United States*, 569 U.S. 530, 544 (2013), and as the "starting point" in the task of a judge to fashion a reasonable sentence. *Freeman v. United States*, 564 U.S. 522, 529 (2011); *see Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016).

The role of the Guidelines in sentencing is significant. But, there is an enormous distinction between Guidelines that are mandatory and Guidelines that are merely advisory. In contrast to when the defendant was sentenced, the Guidelines are now merely advisory, not mandatory. *See, e.g.*, *Rita v. United States*, 551 U.S. 338, 361–62 (2007); *Booker*, 543 U.S. at 260–62.

That the Guidelines are now strictly advisory, rather than mandatory, is a sea change in the law. Judge Bennett has explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'" *United States v. Johnson*, No. RDB-07-0153, ECF No. 183 at 10–11 (D. Md. Oct. 14, 2020); s*ee also McCoy*, 981 F.3d at 285.

Here, Judge Garbis imposed a life sentence on Johnson not because he wanted to do so, but because the Guidelines required him to do so. Indeed, at Johnson's sentencing hearing, Judge Garbis made clear that he did not regard a life sentence as appropriate, but he had no discretion to depart. He stated: "I would prefer, I think a just reason why a just sentence would be less than life sentence in this case on the basis that **I do not believe that is warranted**." ECF 722 at 2 (emphasis added).

As part of the compassionate release analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today. *See, e.g.*, *United States v. Chandler*, GLR-05-0181, ECF 119 at 1–2 (D. Md. May 14, 2020); *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), *aff'd*, *McCoy*, 981 F.3d 271; *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).

Defendant argues that his life sentence appears to be longer than at least some federal sentences imposed more recently for drug offenses involving violence. This assertion is supported by statistics compiled by the United States Sentencing Commission. For example, for fiscal year 2022, the average national sentence imposed for drug trafficking is 78 months (6 years, 6 months); for murder, 261 months (21 years, 9 months); for firearms, 49 months (4 years, 1 month); and for kidnapping, 184 months (15 years, 4 months). *Table 15, "Sentence Imposed by Type of Crime,"* at 64, in *2022 Annual Report and Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION, https://perma.cc/JJ54-A9PC ("2022 Sourcebook"); *see also United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)).

In *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted after a 25-day trial. *See id*., ECF 477; ECF 491. In particular, Floyd was convicted of a racketeering conspiracy that included murders and drug conspiracy. Floyd was not the shooter,

however.  Although his offense level and criminal history category called for a life sentence, Judge Catherine Blake imposed a total sentence of 360 months' imprisonment.  *Id.*, ECF 691.

In *United States v. Antoine*, PWG-19-140, a multi-defendant case, Antoine was involved in a drug trafficking organization in Baltimore, and confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy.  *See id.*, ECF 349 (Plea Agreement) at 9–10.  Pursuant to a plea agreement entered under Fed. R. Crim. P. 11(c)(1)(C), Antoine entered a plea of guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime.  *Id.* Although the defendant shot the victim twice in the head (ECF 349 at 9), the government agreed to a term of imprisonment ranging between 20 and 25 years.  *Id.* at 6.

Antoine was twenty-five years old at sentencing.  ECF 463 (PSR), at 3.  Judge Grimm sentenced the defendant to a total term of 270 months of imprisonment, *i.e.*, twenty-two and a half years.  *Id.*, ECF 465 (Judgment).

The case of *United States v. Blake*, ELH-06-394, is also instructive.[13]  The defendant was convicted of carjacking resulting in death; conspiracy to possess a firearm in furtherance of a crime of violence; possession of a firearm in furtherance of a crime of violence; and murder resulting from possession of a firearm in furtherance of a crime of violence.  *See* ELH-06-394, ECF 62 (Judgment).  In particular, a victim was murdered in the course of a carjacking in which Blake was a conspirator and a participant, and which occurred when the defendant was 17 years old.  *See id.*, ECF 123 at 3; *id.*, ECF 149 at 2.  Blake was originally sentenced to life imprisonment.  *Id.*, ECF 62.  But, his sentence was reduced to 40 years of imprisonment, pursuant to a joint motion by the

---

[13] The case was initially assigned to Judge William Nickerson.  It was reassigned to me on January 29, 2016, due to the retirement of Judge Nickerson.  *See* Docket.

government and the defendant in connection with Blake's petition under 28 U.S.C. § 2255. *Id.*, ECF 123, ECF 127. Then, the sentence was reduced again to 30 years of imprisonment, pursuant to a joint motion for compassionate release. *Id.,* ECF 165, ECF 168.

On the other hand, some sentences meted out by this Court in a murder case have been longer, even when the defendants pleaded guilty. In *United States v. Whisonant, et al.*, ELH-17-191, for example, three of the defendants pleaded guilty to conspiracy to distribute heroin and to discharging a firearm resulting in death, during and in relation to a drug trafficking crime, or to possession of a firearm in furtherance of a drug trafficking crime. The murder was unexpectedly captured, in real time, during an authorized wiretap. One defendant received a total sentence of 360 months imprisonment (ECF 180), another received a sentence of 420 months (ECF 163), and still another received a sentence of 480 months of incarceration. *See* ECF 184.[14]

In *McCoy*, 981 F.3d 271, the Fourth Circuit recognized that "the dramatic degree to which [a defendant's sentence] exceed[s] what Congress now deems appropriate" can provide an extraordinary and compelling reason for a reduction in sentence. *Id.* at 288. The defendants in the cases consolidated for appeal in *McCoy* were convicted of robberies and firearms violations under 18 U.S.C. § 924(c). *Id.* at 274. At the time of their convictions, under the practice known as "stacking," "a conviction [under § 924(c)] was treated as 'second or subsequent,' triggering [a] 25-year minimum sentence, even if the first § 924(c) conviction was obtained in the same case." *Id.* at 275. After the enactment of the First Step Act, however, "the 25-year mandatory minimum applie[d] only when a prior § 924(c) conviction ar[ose] from a separate case and already . . . bec[a]me final." *Id.* (citation and internal quotation marks omitted). The district courts in *McCoy*

---

[14] The sentence of 360 months was subsequently reduced to 295 months by Order of June 26, 2023, pursuant to § 3582(c)(1)(A)(i). *See* ECF 335.

granted sentence reductions in part on the basis that, under current law, the defendants would have received sentences significantly less severe than their "stacked" sentences. *Id.* at 274–75. The Fourth Circuit affirmed, holding that "courts legitimately may consider, under the 'extraordinary and compelling reasons' inquiry, that defendants are serving sentences that Congress itself views as dramatically longer than necessary or fair." *Id.* at 285–86.

Interpreting and quoting *McCoy*, 981 F.3d at 285–86, Judge Blake of this Court explained in *United States v. Myers*, CCB-01-188, 2021 WL 2401237, at *3 (D. Md. June 11, 2021), that a court evaluating a motion for sentence reduction based on a sentencing disparity should consider:

> (1) whether the sentence imposed is grossly disproportionate to a sentence the defendant would likely receive if sentenced today, signifying that the sentence is 'dramatically longer than necessary or fair;' (2) whether the sentence imposed is unusually or grossly lengthy in comparison to sentences currently imposed for similar or more serious offenses; (3) the length of the sentence the defendant already has served; and (4) other personal characteristics of the defendant, which may include the defendant's relative youth at the time of the offense and their post-sentencing conduct in the BOP.

More recently, in *Brown*, 78 F.4th 122, the Fourth Circuit reaffirmed that a defendant's disparate sentence "is relevant to both the 'extraordinary and compelling reasons' inquiry and the § 3553(a) factors." *Id.* at 130. Indeed, the Court determined that the district court erred by failing to consider a defendant's disparate sentence in its compassionate release analysis. *Id.* at 130–31. In the Court's view, two features of the sentence it was reviewing provided extraordinary and compelling reasons for relief: the sentence's "sheer and unusual length" in relation to sentences for more serious and violent crimes, and "the gross disparity between" the sentence "and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id.* at 131.

To be clear, as the government notes, the Guidelines themselves have not changed as to this case. The sentence that Judge Garbis imposed was lawful under the Guidelines and consistent with the Guidelines. But, what has changed is critical: the Guidelines are now strictly advisory. And, there are many instances when defendants exposed to potential life sentences do not receive such draconian sentences.

The government overlooks that this is a case in which the sentencing judge imposed a life sentence only because he had to do so—not because he thought it was appropriate. The shift from mandatory to advisory, along with Judge Garbis's statements at sentencing, explaining that the crime does not warrant a life sentence, and comparative sentencing and compassionate release decisions by judges in this District, bolster Johnson's claim.

In my view, the change in sentencing law since the time of Johnson's sentencing constitutes an "extraordinary and compelling" basis for a sentence reduction.

### B. The Sentencing Disparity Between Johnson and his Codefendants

Johnson also argues that the disparity between his sentence and the sentences of his codefendants provides an "extraordinary and compelling reason for compassionate release." ECF 685 at 16 (capitalization removed). Specifically, Stover Stockton was tried with Johnson, and Rolando Stockton was convicted at a separate trial, but on some of the same charges. *Id.* at 17. As Johnson observes, this Court granted the motions for compassionate release filed by both Stover and Rolando. *Id.*

In particular, in January 2017, Judge Garbis reduced Stover's 390-month sentence to 324 months, pursuant to Amendment 782. ECF 620; ECF 621; ECF 622. Then, in September 2020, under § 3582(c)(1)(A)(i), I reduced the sentence to time served, *i.e.*, approximately 253 months of incarceration, exclusive of good time credit. ECF 657 at 5, 20. By that point, Stover had served

about 75% of his sentence, and had a projected release date of December 2022.  *See* ECF 657 at 5, 20.

Notably, Rolando had Guidelines of 480 months to life.  Judge Garbis initially sentenced him to 330 months.  ECF 677 at 5.  However, the Fourth Circuit reversed the court's departure.  *See United States v. Rolando Stockton*, 349 F.3d 755 (4th Cir. 2003) (per curiam).  This resulted in the sentence of 480 months.

In March 2021, under § 3582(c)(1)(A)(i), I reduced Rolando's 480-month sentence to time served, *i.e.*, almost 22 years of imprisonment, exclusive of good time credit.  But, accounting for good conduct credit, he had served more than twenty-five years of imprisonment.  *See* ECF 685 at 17; ECF 677 at 7, 29–30.

As of the time of Johnson's Supplement, he has served about 24 years (288 months), exclusive of any good conduct credit.  ECF 709-1 at 1.  Johnson argues, ECF 685 at 18:[15]

> In this case, petitioner was no more culpable as both Stover, and Rolando Stockton.  Just like Stover Stockton the jury didn't reach a verdict on the conspiracy to murder counts.  However, unlike Stover and Rolando Stockton petitioner does not have a serious prior criminal record.  Petitioner[']s institutional record is not exemplory [sic].

The government points out that there are significant differences between Johnson and Stover Stockton, and their Guidelines were not identical.  *See*, *e.g.*, ECF 677 at 4; ECF 665-3 (for Rolando).  Specifically, the government contends that Johnson's "analogy fails inasmuch as the

---

[15] Johnson originally argued that "he should've never been sentenced under [the cross-reference] provision."  ECF 685 at 18.  The comment suggests that defendant has not accepted responsibility.  However, through counsel, he states in his Supplement: "To be clear, to the extent that Mr. Johnson's *pro se* motion for a sentence reduction argues that the sentencing court committed errors in determining the applicable United States Sentencing Guideline's provisions, and/or argues that the sentencing court committed errors in applying applicable Guidelines' provisions, and/or in any way argues that an illegal and/or inappropriate sentence was imposed, herein, Mr. Johnson, through undersigned counsel, withdraws those arguments."  ECF 709-1 at 1 n.3.

death cross-reference was not applied as to [Stover] Stockton." ECF 714 at 8; *see* ECF 657 at 4. Further, the government contends that "Stockton presented a much more intensive picture of medical conditions than is present here," and that "the disparity in sentence is perfectly warranted inasmuch as Johnson did more bad acts and presents less in terms of mitigating factors." *Id.* at 8. The government does not address Johnson's argument as to Rolando.

As indicated, this Court reduced Stover Stockton's sentence to time served under 18 U.S.C. § 3582, which amounted to about 21 years. *United States v. Stover Stockton*, ELH-99-352, ECF 657 (D. Md. Sept. 16, 2020). And, the Court also reduced Rolando Stockton's sentence to time served of about 22 years, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *United States v. Rolando Stockton*, ELH-99-352, ECF 677 (D. Md. March 17, 2021). Significantly, however, unlike Stover and Rolando, Johnson was subject to the murder cross-reference. Nevertheless, in my view, a life sentence is disproportionate to the sentences imposed upon Stover and Rolando.

Accordingly, I am satisfied that the sentencing disparities constitute another basis for relief.

### C.  COVID-19 and Johnson's Medical Issues

Johnson claims that he was infected with COVID-19, which resulted in post-infection medical complications and ultimately "increased the severity of petitioner['s] sentence beyond what was anticipated at the time of sentencing." ECF 685 at 13 (capitalization removed). Additionally, he argues that he "should not have been allowed to roam around within U.S.P. Victorville's general population areas while there was a serious outbreak of COVID-19 inside the facility." *Id.* at 15. Specifically, defendant asserts, *id.*: "He should not have been employed, and instead should['ve] been locked in his assigned cell during the mandatory national lockdown." In his view, "BOP had a duty to exercise care under 18 U.S.C. 4042(a)(2)-(3)," but that "duty was breached when prison officials unlocked petitioner's cell door during the mandatory national

35

lockdown" and "ordered him into U.S.P. Victorville's food service area, while COVID-19 was in the facility." *Id.*

According to Johnson, although he "was not legally an essential personnel," he was nonetheless required to work in food service at U.S.P. Victorville, which placed him at greater risk of contracting COVID-19. *Id.* at 5. He explains that, "[o]n April 14, 2020, an advisory was released to the U.S.P. Victorville inmate population" which "notified inmates that the BOP was intending on utilizing inmates for essential work details." *Id.* at 6. This resulted in the daily scenario in which "[a]pproximately, from 4:30 a.m. to 2:30 p.m. (everyday) petitioner was provided just a face mask and ordered into U.S.P. Victorville's food service area." *Id.*

Despite the fact that "COVID-19 was in the penitentiary, [defendant] did not object to his designation." *Id.* In July 2020, infected food service officers "reported to U.S.P. Victorville's food service area for work," and "Petitioner had no alternative, but to be confined in the same general area as the COVID-19 infected officers." *Id.*

Johnson asserts that he tested positive for COVID-19 on July 22, 2020. *Id.* In his view, "[h]e contracted the virus from his exposure to the infected U.S.P. Victorville officials in the food service area, or the COVID-19 within the penitentiary." *Id.* Johnson was placed in quarantine, where "he experienced physical pain in his chest, stomach, organs, and eyes," as well as "mental anguish" including "severe anxiety, stress, depression, and the terror of death." *Id.* at 7.

Johnson's claims regarding prison conditions are more akin to a civil rights complaint under 42 U.S.C. § 1983. These complaints do not warrant compassionate release.

In addition, defendant claims that he "is still experiencing long haul COVID-19 symptoms," which "includ[e] brain fog, headaches, sudden breathlessness, fatigue, pain and inflammation throughout his body, gastrointestinal, and heart complications." *Id.* He avers, *id.*:

"On numerous occasions petitioner has sought medical help for the long haul COVID-19 complications."  But, he contends that "[t]he symptoms were dismissed as non-existent, and he was threatened with disciplinary action by prison staff if he kept seeking medical help."  *Id.*  He "was taken to the community hospital a few times regarding the long haul COVID-19 complications."  *Id.*

Johnson also contends that he has a "history of multiple episodes of abdominal pain" and, following his "COVID-19 infection, the pain episodes have substantially exacerbated."  *Id.*  Additionally, Johnson notes that "[l]ong haul COVID-19 was recognized as a disability with the Americans with Disabilities Act in 2021."  *Id.*  And, he complains that "[t]he ongoing COVID-19 pandemic does not allow for petitioner to receive proper medical care while in prison, and [h]is condition is unlikely to improve through institutional treatment."  *Id.* at 15.[16]

The government states that Johnson "does not claim to have any uniquely debilitating medical condition."  ECF 714 at 1.  The government characterizes Johnson's long haul COVID-19 symptoms as mere "vague symptoms," and asserts that Johnson "fails to tie any specific personal medical condition to a dramatically increased chance of severe illness."  *Id.* at 8.  Further, it argues that Johnson "has not made the case that COVID presents a unique and extraordinary risk to him that cannot be mitigated with vaccines and other treatments."  *Id.*  The government also asserts that COVID-related claims are "routinely denied by Courts" because "vaccines are now widely available and highly effective."  *Id.* at 1.

Additionally, the government contends that because defendant got COVID-19 and survived, he does not have a COVID-19 claim.  *Id.* at 8.  It states, *id.*: "[Defendant] admits he

---

[16] This contention again seems more like a claim under 42 U.S.C. § 1983 than a claim for compassionate release.

previously contracted the virus, and has ostensibly not deteriorated or become seriously ill.  In short, he was able to recover."

Johnson has explained that, since being stricken with COVID-19 in July 2020 (ECF 685-1 at 29–30), he has experienced long haul COVID-19 symptoms, for which he has repeatedly been taken to the hospital.  As noted, these ailments "includ[e] brain fog, headaches, sudden breathlessness, fatigue, pain and inflammation throughout his body, gastrointestinal, and heart complications."  ECF 685 at 7.  He asserts that his long-haul condition has exacerbated his long-documented abdominal issues.

However, Johnson's medical records do not reflect the diagnosis of a long-haul COVID-19 condition or the symptoms Johnson describes.  The defendant's medical records reflect that he has received treatment for abdominal issues.  However, the records do not reflect that the issues are connected to long-haul COVID-19.  *See* ECF 685-1 (Medical Records).

To be sure, long-haul COVID-19 was recognized in July 2021 as a condition that could qualify as a disability under the Americans with Disabilities Act.  *See Long COVID or Post-COVID Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (July 20, 2023), https://perma.cc/Y9J3-H9F3.  But, the CDC has not included long-haul COVID-19 on its extensive list of medical conditions that could exacerbate a COVID-19 infection.  *See People with Certain Medical Conditions* (listing comorbidities such as cancer, chronic kidney disease, chronic liver disease, chronic lung diseases, cystic fibrosis, dementia or other neurological conditions, diabetes (type 1 or type 2), heart conditions, HIV infection, immunocompromised condition or weakened immune system, mental health conditions, obesity, physical inactivity, pregnancy, sickle cell disease or thalassemia, smoking, solid organ or blood stem cell transplant, stroke or cerebrovascular disease, substance abuse disorders, tuberculosis, disabilities such as one that

"makes it more difficult to do certain activities or interact with the world around them," cerebral palsy, birth defects, attention-deficit/hyperactivity disorder, intellectual and developmental disabilities, learning disabilities, spinal cord injuries, and people with Down syndrome).

As noted, defendant's medical records show that he has long-standing abdominal issues. On January 11, 2020, defendant's medical provider stated that "Patient has history of multiple episodes of abdominal pain"; he explained that Johnson has had this issue for "the last three years with no" diagnosis.  ECF 685-1 at 3, 35.  On January 13, 2020, the "assessment" of defendant was "[u]nspecified abdominal pain."  *Id.* at 4.  He was sent to the emergency room at the "local hospital."  *Id.*  On March 9, 2020, defendant again experienced abdominal pain, with the doctor noting that in the preceding three days, defendant had "abdominal pain with vomiting and mild diarrhea" and "see[s] blood when vomiting."  *Id.* at 7.  On March 17, 2020, defendant sought medical care again for abdominal issues.  *Id.* at 10.  After an examination, his "assessment" was "[g]astro-esophageal reflux disease with esophagitis" and "[u]nspecified abdominal pain."  *Id.* at 9.  Defendant's medical records also reflect medical examinations concerning his abdominal pain on January 25, 2021 (*id.* at 23), July 21, 2021 (*id.* at 25), July 26, 2021 (*id.* at 31), and December 27, 2021.  *Id.* at 27.

However, defendant's condition of generalized abdominal issues is not a sufficient basis on which to grant compassionate release.  Similar to long-haul COVID-19, abdominal issues have not been listed by the CDC as a risk factor for severe illness due to COVID-19.  *See People with Certain Medical Conditions.*  And, Johnson has not adequately explained why this condition cannot be sufficiently treated while he is incarcerated.

Thus, to the extent that Johnson relies on COVID-19 as a basis for his release, he must establish some ground, such as a qualifying medical condition, to demonstrate that he is

particularly susceptible to severe illness from COVID-19 and thus eligible for compassionate release.  And, as discussed, defendant appears to be in relatively good health.

Further, the fear of COVID-19 does not constitute an extraordinary and compelling circumstance that warrants an inmate's release. Judge Chasanow of this Court has explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . . , generalized and unspecific reasons . . . do not satisfy the standard for compassionate release."  *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).  Accordingly, Johnson has failed to establish extraordinary and compelling circumstances for his release based on vulnerability to the coronavirus.

In *Brown*, 78 F.4th 122, the Fourth Circuit explained that, "[t]o establish that the risk posed by COVID-19 presents an 'extraordinary and compelling reason' for release, a defendant must allege 'that the risk of contracting COVID-19 in a prison is higher than the risk outside the prison and that [his] preexisting medical condition increases [his] risk of experiencing a serious, or even fatal, case of COVID-19.'"  *Id.* at 128 (quoting *High*, 997 F.3d at 185).  Further, the *Brown* Court explained that, although "this 'inquiry is multifaceted and must account for the totality of the relevant circumstances,' courts within the Fourth Circuit have looked to whether 'an inmate shows both a particularized susceptibility to COVID-19 and a particularized risk of contracting the disease at his prison facility.'"  *Id.*  (citations and some quotation marks omitted).

Defendant has not identified or provided evidence of any special vulnerabilities.  Indeed, the information provided to the Court suggests that defendant is generally healthy.  Johnson's medical conditions—*i.e.*, vague abdominal issues and alleged long-haul COVID-19—fail to qualify as an "extraordinary and compelling" basis to grant compassionate release.

### D.  The § 3553(a) Factors

My conclusion that defendant has identified "extraordinary and compelling reasons" for relief does not end the inquiry.  I must also consider whether the sentencing factors under 18 U.S.C. § 3553(a) warrant a sentence reduction.  *See Brown*, 78 F.4th at 128; 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I conclude that, under the sentencing factors enumerated in § 3553(a), it is appropriate to reduce defendant's sentence to 420 months of imprisonment (35 years).

The applicable factors in § 3553(a) include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Johnson argues that, considered together with the disparity of his sentence, his youth at the time of the crime and his current age, as well as his difficult upbringing, collectively constitute "factor[s] this Court can and should consider in finding extraordinary and compelling reasons for a sentence reduction."  ECF 709-1 at 12.  Johnson additionally argues that he is not a dangerous man and thus relief is appropriate under 18 U.S.C. § 3582(c)(1)(A).  ECF 385 at 18.  Specifically, he claims that "[a]lthough he was sentenced as a cross-reference murderer offender[,] . . . [t]oday the cross-reference [p]rovisions would not apply."  *Id.*  He argues at length that Judge Garbis erroneously applied the murder cross-reference.  *Id.* at 18–22.  However, in his Supplement, Johnson withdrew all arguments suggesting Judge Garbis committed an error when determining the applicable Guidelines provisions, applying the applicable Guidelines provisions, or imposing the life sentence.  ECF 709-1 at 1 n.3.

The government contends that "Johnson's motion fails under the 3553(a) factors."  ECF 714 at 9.

### 1.  Johnson's Age and Background[17]

Defendant argues that his age at the time of the offense and his current age, as well as his difficult upbringing, are "factor[s] this Court can and should consider in finding extraordinary and compelling reasons for a sentence reduction."  ECF 709-1 at 12.

As noted, during the conspiracy, Johnson was between the ages of 16 and 22 years old.  At the time of the murder of Mr. Matthews, Johnson was 20 years old.  ECF 709-1 at 12.  He asserts: "In 1999 petitioner was a thrill-bent 21 year old young adult who was extremely emotionally immature, 'indeed irresponsible.'"  ECF 685 at 10.  Defendant adds that he has significantly matured and "he can affirmatively [s]tate that 'the irresponsible, immature kid he was then, is not the [m]an he is today,'" as now, "'he is past the age of a hot headed youth.'"  *Id.* (quoting *United States v. Readus*, 2020 WL 2572280, at *4 (E.D. Mich. May 21, 2020)).

In his Supplement, Johnson posits that "youth matters in sentencing."  ECF 709-1 at 12 (citing *Jones v. Mississippi*, ___ U.S. ___, 141 S. Ct. 1307, 1314 (2021)).  He notes that in most cases where "defendants have received 'a life to a term of years sentence reduction', if you will, the relative young age of the defendants at the time of having committed the offenses is a significant factor in the sentencing court's analysis."  ECF 709-1 at 12.

Defendant cites *McCoy*, 981 F.3d 271, for the proposition that the Fourth Circuit "approved" of the courts' "consideration" of the defendants' ages at the time of the offenses.  ECF 709-1 at 12.  The *McCoy* Court noted, 981 F.3d at 286, that "the courts focused on the defendants'

---

[17] In my view, defendant's age is more appropriately considered as a personal characteristic of the defendant, rather than as an independent basis for compassionate release.

relative youth – from 19 to 24 years old – at the time of their offenses, a factor that many courts have found relevant under § 3582(c)(1)(A)." In this regard, defendant points to cases recognizing that the brains of juveniles are "fundamentally different than those of adults." ECF 709-1 at 12. He also points to Maryland's "Juvenile Restoration Act ("JRA"), enacted in 2021, which prohibits courts from sentencing juveniles to life in prison without the possibility of parole, removes a mandatory minimum for any of those sentences, and allows people who have been imprisoned at least 20 years for crimes committed when they were juveniles to file a motion to reduce their sentence." *Id.* at 13; *see* 2021 Maryland Laws, Ch. 61 (Eff: 10/1/21).

Additionally, Johnson observes that his "childhood was marked by astonishing adverse experiences that cannot be discounted as direct causes that led [him] to engage in the serious criminal activities that resulted in receiving a life sentence at the very young age of 23." ECF 709-1 at 16. Specifically, Johnson notes that his "mother was a 14 year old child when she gave birth to Mr. Johnson; she spent most of Mr. Johnson's early childhood and adolescence disoriented in an unmerciful heroin addiction; Mr. Johnson's father was a pedophile and chronic heroin abuser." *Id.* at 17. Moreover, defendant was physically abused by his mother and neglected by his parents and family. *Id.* at 18. A psychological evaluation of Johnson at eleven years of age found that "he has suffered through a great deal of environmental and social deprivation that stymies his learning" and that he "is truly an at-risk child." *Id.* His first arrest was at age 12; he was committed to a youth facility at age 13. *Id.* At age 15 and again at 16, he was arrested for a controlled substance offense and again committed to a youth facility. *Id.*

Ultimately, Johnson argues that, taking his age and background into account, the "Court should find that Mr. Johnson's age at the time of his offense was a significant and direct causal

factor in his inability to negotiate the harsh vicissitudes of his life's circumstances, which, in turn, was a proximate cause of his criminal actions." *Id.*

The government characterizes Johnson's contention as a claim that "the life sentence imposed by Judge Garbis—which was lawful at the time of sentencing and which is still lawful today—is simply too long." ECF 714 at 1. In its view, defendant is not entitled to compassionate release "where the defendant is simply asking for a reconsideration of a life sentence based on the defendant's age when the crime was committed or the harshness of having to serve a life sentence, particularly where the underlying offense involved violence and murder." *Id.* at 5. Further, the government asserts that Johnson "was an organizer and leader of this group, and they were using minor children to facilitate their trade," which made "Johnson and [Stover] Stockton . . . the mature ones of the group and they were calling the shots." *Id.* at 7.

Defendant's age at the time of the offense weighs in his favor. As stated previously, Johnson was between the ages of 16 and 22 during the conspiracy. Thus, he was a minor during a good portion of the conspiracy. *See McCoy*, 981 F.3d at 286 ("[I]n determining that release was appropriate for all of the defendants, the courts focused on the defendants' relative youth – from 19 to 24 years old – at the time of their offenses, a factor that many courts have found relevant under § 3582(c)(1)(A)(i) . . . .") (internal citations omitted); *see, also e.g.*, *United States v. Gantt*, EFM-10-10175, 2023 WL 2140151, at **3, 6 (D. Kan. Feb. 21, 2023) (considering defendant's age of 21 at time of conviction as weighing in favor of release); *United States v. Newton*, JLT-94-5036, 2022 WL 3029332, at *4 (E.D. Cal. Aug. 1, 2022) ("Courts also consider factors such as the defendant's age at present and at the time of conviction, evidence of rehabilitation, and the percentage of the original sentence that a defendant has already served.") (citations omitted); *United States v. Robles*, 553 F.Supp.3d 172, 185 (S.D.N.Y. 2021) ("[G]iven Robles's youth [(*i.e.*,

44

age 23)] at the time of his offense, it is conjecture to forecast that society would need protection from him three and a half decades later."); *United States v. Lee*, EEF-04-11, 2021 WL 3129243, at *4 (E.D. La. July 23, 2021) (reducing defendant's sentence, in part, because he "was only 23 years old at the time of the carjackings"); *United States v. Maumau*, TC-08-758, 2020 WL 806121, at *5, 7 (D. Utah Feb. 18, 2020) (noting defendant's age of 24 at sentencing, in combination with other factors, when granting compassionate release).

Moreover, Stover Stockton was more than seven years older than Johnson, ECF 656 at 1, and Rolando Stockton was more than five years older than Johnson.  ECF 677 at 3.  Unlike Johnson, both Stover and Rolando were not minors during the conspiracy.  Johnson was also in juvenile custody during a portion of the conspiracy, and was not released until August 22, 1995. ECF 721.

Johnson's background sheds important light on the context in which the conspiracy arose. By the time Johnson was charged with the conspiracy in 1999, he had been, in his words, abandoned by his family and incarcerated multiple times for juvenile offenses.

Further, Johnson contends that his current age of 45 should also be considered.  He points out that "research by the [S]entencing [C]ommission also supports the conclusion that, 'older criminal defendants are less [l]ikely to re-offend.'" ECF 685 at 10.  And, he claims that after "two decades of incarceration" he "has substantially matured." *Id.*  Indeed, he contends that he has "had enough time to reflect on who he was in the past, and the person he wants to be in the future" and that he has changed. *Id.*

Defendant has gone from a young man to middle aged, as he is now 45 years old.  ECF 709-1 at 1.  That, too, weighs in defendant's favor.

"Recent analysis from the Bureau of Justice Statistics considering the recidivism rates of released prisoners in 30 states (including [Maryland]) from 2005 to 2010 supported the Commission's conclusion, finding decreased recidivism rates as prisoners age.[ ]" *United States v. Payton*, 754 F.3d 375, 377 (6th Cir. 2014) (emphasis added) (citing United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010* at 12 (April 2014), https://perma.cc/ZE9K-QD9U; *see also United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) ("[S]tudies demonstrate that the risk of recidivism is inversely related to an inmate's age."). Indeed, those aged 40 years or older had the lowest recidivism rates. *See Recidivism of Prisoners*, at 12.

Moreover, district courts in the Fourth Circuit have considered a defendant's current age as it relates to recidivism when balancing the § 3553(a) factors in a motion for compassionate release. *See, e.g.*, *United States v. Hill*, 2023 WL 35211, at *9 (E.D. Va. Jan. 4, 2023) (age 59); *United States v. Mills*, DCN-97-815, DCN-98-786, 2022 WL 206074, at *6 (D.S.C. Jan. 24, 2022) (age 57); *United States v. Epstein*, JKB-17-453, 2020 WL 4339325, at *2 (D. Md. July 28, 2020) (age 60). Given Johnson's current age, he is less susceptible to the risk of recidivism, which weighs in his favor.

I conclude that Mr. Johnson's youth at the time of the offense, his current age, and his difficult upbringing are factors that I generally may consider.

### 2. Rehabilitation

Johnson argues that his "rehabilitation efforts demonstrate [that] petitioner will be a contributing member of society." ECF 685 at 22. He argues, *id.* at 23:

> Before the FSA, petitioner woke up to another day of his life sentence. Since their [sic] is no federal parole, petitioner had no hope of ever going home. However, he still participated in the 444 hours of educational courses. Ample evidence is presented herein to support the effectiveness of petitioner's

incarceration as deterrence to recidivism. Especially during the COVID-19 pandemic, his behavior suggests that he will likely be an asset – "not a risk to the public." Petitioner is not the perfect man. But he is the perfect candidate for a second chance, and a compassionate release.

In his Supplement, Johnson asserts: "During the last 23 years or so, he has meaningfully matured spiritually so that he will now be able to successfully negotiate the tribulations that life capriciously and forcefully hurls." ECF 709-1 at 2. He claims that, during his incarceration, he "has emotionally and spiritually evolved to the point that he viscerally understands the pain that he caused other people because of his criminal acts" and "is capable of being empathetic." *Id.* at 19. Specifically, defendant "recognize[s] the depression, pain, anguish, and frustration that the victims, and their families experience.[l]" *Id.*

In correspondence to the Court, Johnson has explained, ECF 704 at 1:

> I take full responsibility for my negative decisions regarding this case. I recognize the depression, pain, anguish, and frustration that the victims, and their families experience. I know that I can[']t change the past, and I apologize to the victims, their family, and everyone who has been affected by this case.

Further, Johnson said, *id.* at 2–3:

> The time that I spent in prison allowed me enough time to reflect on the ignorant, immature, idiotic kid that I was. I realize that there is far more to life than to feel accepted. Spirituality has increased me as a man, and led me to GOD. Now I don[']t need to feel accepted, because I know that I am accepted.

> Today I can affirmatively say that the kid I was at age 21, is not the man I am today. If this court grants compassionate release, and give[s] me a second chance at life. I will not squander that chance.

Johnson has also participated in programming while incarcerated and, to his credit, he has obtained his GED. *See* ECF 709-4; ECF 709-1 at 19. Mr. Johnson wrote, ECF 709-1 at 19: "I'm proud of my GED certificate. I'm not sure the last year that I was in school before being arrested on this case. I believed I was in the 11th grade when I dropped out."

As of the filing of his Motion, Johnson "accomplished approximately 444 hours of rehabilitation courses." ECF 685 at 4; *see also* ECF 685-2. Further, "Petitioner completed a myriad of programs," which "includ[e] the obtainment of his general education diploma (G.E.D)" early in his sentence. ECF 685 at 5; ECF 709-1 at 2. And, "Petitioner also worked consistently throughout his incarceration, and gained employable work skills," and "is currently the lead baker in U.S.P. Victorville's food service." ECF 685 at 5; ECF 709-1 at 2. This is commendable.

But, the government maintains that Johnson has not been rehabilitated and that "rehabilitation need not even be considered" because Johnson has failed to show an extraordinary and compelling reason for his release. ECF 714 at 8. Moreover, the government asserts that "Johnson has a plethora of disciplinary infractions while in prison, and he has established nothing in the way of rehabilitation, other than taking some coursework which is to be expected, but which is not extraordinary." *Id.* at 8–9. Nor has Johnson "claim[ed] any change in family circumstances." *Id.* at 1.

The government points to the severity of the crime—the fact that "defendant was engaged in a conspiracy to traffic heroin, and in the process he committed murder," and also had associates who "committed another murder and other violent acts" and "[t]hey used children to facilitate their drug trade." *Id.* at 10. It also argues that "defendant has a history of violence," reflected in his criminal history category of IV and prior assault and drug-related convictions. *Id.* at 10. Further, it argues that "Judge Garbis presided over this matter, heard the testimony, and held that life imprisonment was a proper sentence," and "[i]t would do nothing for deterrence or fostering respect for the law in this defendant if he were released now" because he has a significant portion of his sentence remaining. In addition, the government contends that that Johnson's "attempts at rehabilitation are laudable," but "they are not so extraordinary that they merit release." *Id.* at 11.

48

Further, the government notes that defendant has not been rehabilitated because "he denies the evidence tied him to the Matthews murder." *Id.* at 12.  Finally, the government claims that defendant is a danger to the public because of his infractions during his incarceration.  *Id.*

The gravity of Johnson's crimes cannot be minimized. He was charged with serious offenses and, following a lengthy trial, he was convicted of participating in a violent drug trafficking organization. The conspiracy spanned a lengthy period, from 1994 to 2000, and involved an enormous quantity of drugs.  In addition, Judge Garbis applied the murder cross-reference to Johnson for the murder of Mr. Matthews.  *Id.* at 6–7.  Yet, Johnson denied culpability. ECF 722 at 8.  He again did so in the pro se portion of his Motion.  ECF 685 at 21.

As the government also notes, Johnson has committed multiple disciplinary infractions while incarcerated.  *See* ECF 714 at 3–4; ECF 714-1.  Over the course of 24 years, his infractions include assault, possession of a dangerous weapon, interfering with security devices, possession and use of intoxicants, refusing to obey an order, and phone abuse.  ECF 714 at 3–4.  However, in the past ten years, he has not engaged in assault or possession of a dangerous weapon.  *Id.*

Johnson addresses his disciplinary infractions in his Motion.  He explains that since 1999, "he has been housed at high security United States Penitentiarys [sic]."  ECF 685 at 8.  He argues that "[h]igh security prisons are notorious for the mayhem that routinely occurs inside U.S.P.s," and "[m]any inmates in high security institutions participate in violent activities and are wary of those who refuse to do so."  *Id.*  As of the time of the Motion, his last infractions were in 2021, and consisted of interfering with a security device and phone abuse.  ECF 714 at 4.  And, defendant claims that "[t]he majority of his infractions are 200/300 series infractions."  ECF 685 at 8.  After battling addiction, Johnson claims that he does not use drugs and has "been clean for over 3 years with no treatment."  ECF 709-1 at 20.  These infractions are concerning.

On the positive side, despite defendant's lengthy incarceration, Johnson "has maintained a strong support network of loved ones who are ready to assist him should he be given the opportunity of a release date." ECF 709-1 at 2. Indeed, the correspondence submitted to the Court on Johnson's behalf reflects this support.

To illustrate, Johnson's wife explains: "Levy has a loving and caring family waiting for him, our family has a business (Johnson's Post Construction LLC.) so he would have employment, resources and home awaiting his arrival." ECF 697 at 1. She also asserts that Johnson "is truly apologetic, and he understands how the laws work due to the circumstance he created as a youth." *Id.*

Additionally, Johnson's son states that while his "father has been incarcerated since [he] was 6 months old," he "can truly say that [his] dad has always made an effort to be present in [his] life even with the difficulties of the time zones, constantly relocating, & 15 minute phone calls." ECF 698 at 1. Further, he states, *id.*:

> My father has tried his absolute hardest to still be a factor in my life despite the barriers that were in place preventing him from Being [sic] 100% present. I will forever appreciate and acknowledge that my DAD DID NOT GIVE UP ON HIS RESPONSIBILITIES AS A MAN. My dad inspired me to get into the community and mentor the youth (especially young boys).

Johnson's mother has written about "the pain and emptiness [she has] endured without [her] son Levi." ECF 699. She recounts many hardships in her life, including past drug usage. *Id.* But, she explains, *id.*: "I am now established, drug free for over 15years [sic], I have a nice job and a house I can call home so I can always have a place for my children to go." She notes that if released, Johnson "will have a job waiting on him and a place to live." *Id.* She also reiterates that his incarceration "has truly taught him the difference between a boy and a man," and that their family is "looking forward to hopefully having him back in [their] lives." *Id.*

I am also mindful that Johnson's incarceration in the midst of a global pandemic has "increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10- 761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

But, as the government suggests, the Court cannot overlook that, despite engaging in the underlying criminal activity at such a young age, "defendant has a history of violence." *Id.* at 10. Moreover, Johnson's crime was extremely serious.  And, he held a leadership role in a drug trafficking organization, and was found by Judge Garbis to have murdered Mr. Matthews.  ECF 402 at 6–7.  Such conduct was in complete disregard to the safety of others.  Moreover, the conduct at issue occurred over a lengthy period—from 1994 to 2000.  ECF 721, at ¶ 1.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Accordingly, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact.  The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in this Circuit and elsewhere have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020

WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F. Supp. 3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

As I see it, the period of incarceration that Johnson has served to date is not sufficient to justify his immediate release.  In particular, this was a very serious case, involving a large quantity of dangerous drugs and a drug-related murder.  A substantial sentence is warranted, not only as punishment and to protect the public, but also to promote respect for the law.  Moreover, defendant's institutional record substantiates my conclusion that release of defendant at this time is not appropriate.

However, the sentence of life imprisonment is unduly harsh and disproportionate, for all the reasons that I have said.  In addition, a reduction is warranted in light of Johnson's educational efforts, sustained employment, leadership role as a baker, and support from loved ones.

In view of the foregoing, I conclude that the factors under 18 U.S.C. § 3553(a) weigh in favor of reducing Johnson's sentence from life imprisonment to thirty-five years of imprisonment, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), with the added requirement of five years of supervised release, to include the mandatory and standard conditions of supervision that were previously imposed.

### V.      Conclusion

For the foregoing reasons, I shall grant the Motion (ECF 685, ECF 709, ECF 709-1), in part.  And, I shall adopt all of the previously imposed terms and conditions of supervised release.

An Order follows, consistent with this Memorandum Opinion.

Date: October 27, 2023                                    _____/s/_____
                                                         Ellen Lipton Hollander
                                                         United States District Judge